**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| DONNA CLARK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>GRAYROBINSON, P.A.,<br><br>Defendant. | Case No.: 6:26-cv-00930<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Donna Clark ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant GrayRobinson, P.A. ("Defendant"), alleging as follows.

## NATURE OF THE ACTION

1. This class action is about Defendant's wrongful disclosure of Plaintiff's and approximately 65,000 Class Members' sensitive personally identifiable information ("PII") and personal health information ("PHI") in a foreseeable, preventable data breach.

2. From March 5 through March 24, 2025, criminal hackers targeted and accessed Defendant's network systems and stole Plaintiff's and Class Members' confidential PII and PHI stored therein, causing widespread injuries to Plaintiff and Class Members (the "Data Breach"). The Data Breach compromised Plaintiff's

and Class Members' most sensitive and private PII and PHI, including their full names, dates of birth, Social Security numbers, driver's license and government identification numbers, financial account information, health insurance information, medical diagnosis and treatment information, and other sensitive data (collectively, "Private Information").

3. Defendant is a is a law firm with offices in Florida and Washington D.C.

4. Plaintiff and Class Members are current and former clients of Defendant who, in order to obtain services from Defendant, were and are required to entrust Defendant with their sensitive, non-public Private Information. Defendant could not perform its operations or provide its services without collecting Plaintiff's and Class Members' Private Information and retains it for many years, at least, even after the client relationship has ended.

5. Businesses like Defendant that handle Private Information owe the individuals to whom that data relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will

harm the affected individuals, including by invasion of their private health and financial matters.

6. Defendant breached these duties owed to Plaintiff and Class Members by failing to safeguard their Private Information it collected and maintained, including by failing to implement industry standards for data security to protect against, detect, and stop cyberattacks, which failures allowed criminal hackers to access Defendant's systems for weeks without being caught, stealing individuals' Private Information from Defendant's care.

7. Although the Data Breach took place in March 2025, Defendant waited *over a year* before notifying affected individuals their Private Information was compromised in April 2026, diminishing Plaintiff's and Class Members' abilities to timely and thoroughly address the increased and imminent risk of identity theft and other harms the Data Breach caused.

8. Defendant failed to adequately protect Plaintiff's and Class Members' Private Information––and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its clients' sensitive data.

9. Defendant maintained the Private Information in a reckless manner. In particular, Private Information was maintained on and/or accessible from

Defendant's network in a condition vulnerable to cyberattacks. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

10. Hackers targeted and obtained Plaintiff's and Class Members' Private Information from Defendant's network because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendants' inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiff's and Class Members' Private Information has been accessed by hackers and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

11. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their

credit, financial accounts, and email accounts, and take several additional prophylactic measures.

12. As a result of the Data Breach, Plaintiff and Class Members suffered and will continue to suffer concrete injuries in fact, including but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breach, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

13. To recover from Defendant for these harms, Plaintiff, on her own behalf and on behalf of the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, and unjust enrichment, to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information in its care.

14. Plaintiff and Class Members seek damages and equitable relief requiring Defendant to (a) disclose the full nature of the Data Breach and types of Private Information exposed; (b) implement data security practices to reasonably guard against future breaches; and (c) provide, at Defendant's expense, all Data Breach victims with lifetime identity theft protection services.

## PARTIES

### *Plaintiff Donna Clark*

15. Plaintiff is an adult individual who at all relevant times has been a citizen and resident of Dunn, North Carolina.

16. Plaintiff provided her Private Information to Defendant as a condition of and in exchange for obtaining services from Defendant.

17. Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

18. Plaintiff would not have provided her Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

19. At the time of the Data Breach, Defendant retained Plaintiff's Private Information in its network systems with inadequate data security, causing Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

20. Since the Data Breach occurred, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has already spent hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

21. Plaintiff further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

22. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress—especially given the fact that cybercriminals now have her most personal and sensitive Private Information in their possession—which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence or the information stolen.

23. Plaintiff further believes her Private Information, and that of Class

Members, will be sold, published, and further disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

24. The risk of identity theft is not speculative or hypothetical; it is impending and materialized, as Plaintiff's Private Information has already been misused in that it was targeted, accessed, and stolen by cybercriminals intent on exploiting it.

25. Moreover, following the Data Breach, Plaintiff has experienced suspicious spam and believes this be an attempt to secure additional Private Information from her.

26. Subsequent to the Data Breach, Plaintiff has suffered and will continue to suffer numerous, substantial injuries including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of her Private Information; (f) invasion of privacy; and (g) the continued risk to her Private Information, which remains in Defendant's possession and subject to further breach so long as Defendant fails to undertake adequate measures to protect it.

*Defendant GrayRobinson, P.A.*

27. Defendant is a Florida corporation with its principal place of business at 301 E. Pine Street, Suite 1400, Orlando, Florida 32801.

## JURISDICTION AND VENUE

28. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Class Member is diverse from Defendant, including Plaintiff, and there are over 100 putative Class Members.

29. This Court has general personal jurisdiction over Defendant because Defendant is incorporated in the state of Florida and maintains its headquarters and principal place of business in the state of Florida.

30. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### A. Defendant Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.

31. Defendant is a law firm with offices in Florida and Washington D.C. and operations throughout the United States.

32. Plaintiff and Class Members are current and former clients of Defendant who received services from Defendant prior to the Data Breach.

33. As a condition and in exchange for receiving services from Defendant, Defendant's clients, including Plaintiff and Class Members, were required to entrust Defendant with highly sensitive Private Information, including their names, dates of birth, Social Security numbers, financial account information, driver's licenses and government identification documents, medical histories including diagnosis and treatment information, health insurance information, and other sensitive data.

34. The information Defendant held in its network server at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

35. At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiff and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

36. Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was

compromised, as well as intrusion into those individuals' highly private medical information.

37. In exchange for receiving Plaintiff's and Class Members' Private Information, Defendant promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

38. Upon information and belief, Defendant made promises and representations to its clients, including Plaintiff and Class Members, that the Private Information collected from them as a condition of obtaining services from Defendant would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it were no longer required to maintain it.

39. For example, Defendant's Notice of Privacy Practices promised and affirmed to Plaintiff and Class Members, "GrayRobinson has implemented and we routinely update and maintain appropriate administrative, physical and technical security measures to help protect your data from unauthorized access. Some of the safeguards we use to protect your data are firewalls and data encryption, information access controls, controlled access to our facilities and 24/7 monitoring of our systems databases."[1]

[1] https://www.gray-robinson.com/p/5/privacy-policy.

40. Further, Defendant's Notice of Privacy Practices warrants that Private Information will be disclosed only in the specific enumerated circumstances, which do not include disclosure to cybercriminals in a breach.

41. Plaintiff and Class Members relied on these promises from Defendant, a sophisticated business entity and law firm, to implement reasonable practices to keep sensitive Private Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Private Information from Defendant's systems when no longer necessary for its legitimate business purposes.

42. But for Defendant's promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have sought services from or entrusted their Private Information to Defendant. Legal clients and consumers, in general, demand security to safeguard their Private Information, especially when sensitive medical information is involved.

43. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its promises and duties to keep such information confidential and protected from unauthorized access.

44. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

45. Defendant derived economic benefits from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform its operations, furnish the services it provides, or bill and receive payment for those services.

46. By obtaining, using, and benefiting from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

47. Defendant had and has a duty to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks and those of its vendors and affiliates.

48. Additionally, Defendant had and has obligations created by the FTC Act, 15 U.S.C. § 45, HIPAA, common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private

Information confidential and protected from unauthorized disclosure. Defendant failed to do so.

**B. Defendant Failed to Adequately Safeguard Plaintiff's and Class Member's Private Information, resulting in the Data Breach.**

49. On or about March 24, 2025, Defendant detected unauthorized access to its network that resulted in the potential exposure of a limited amount of data it maintains.[2] Upon learning of this issue, Defendant launched an investigation to determine the nature and scope of the Data Breach.[3]

50. Following the completion of its investigation, it was determined on April 13, 2026, that the impacted files may have contained some personal information.[4]

51. Upon information and belief, the following types of Private Information were compromised as result of the Data Breach: first and last name, date of birth, Social Security Number, driver's license number, state/government ID, financial account information, medical information, and health insurance information.[5]

[2] https://www.gray-robinson.com/p/192/notice-of-incident (last visited April 27, 2026).
[3] *Id.*
[4] *Id.*
[5] *Id.*

52. Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiff's and Class Members' Private Information from Defendant's network systems, where they were kept without adequate safeguards and in unencrypted form.

53. Defendant could have prevented this Data Breach by properly training personnel and/or securing and encrypting the files and file servers containing Plaintiff's and Class Members' Private Information, but failed to do so.

54. As the Data Breach evidences, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiff and Class Members, such as standard monitoring and altering techniques, encrypting the information, or deleting the information when it is no longer needed. These failures by Defendant allowed and caused cybercriminals to target Defendant's network, carry out the Data Breach for *weeks* without detection, and exfiltrate files containing Plaintiff and Class Member's Private Information under Defendant's nose.

55. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiff's and Class Members' Private Information, using controls like limitations on personnel with access to sensitive data and requiring multi-factor authentication ("MFA") for

access, training its employees on standard cybersecurity practices, and implementing reasonable logging and alerting methods to detect unauthorized access.

56. For example, if Defendant had implemented industry standard logging, monitoring, and alerting systems—basic technical safeguards that any PHI and/or PII-collecting company is expected to employ—then cybercriminals would not have been able to perpetrate prolonged malicious activity in Defendant's network systems for weeks without alarm bells going off, including the reconnaissance necessary to identify where Defendant stored Private Information, installation of malware or other methods of establishing persistence and creating a path to exfiltrate data, staging data in preparation for exfiltration, and then exfiltrating that data outside of Defendant's system without being caught.

57. Defendant would have recognized the malicious activities detailed in the preceding paragraph if it bothered to implement basic monitoring and detection systems, which would have stopped the Data Breach or greatly reduced its impact.

58. Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiff's and Class Members' Private

Information, meaning Defendant had no effective means in place to ensure that cyberattacks were detected and prevented.

**C. Defendant Knew the Risk of a Cyberattack Because Businesses in Possession of Private Information Are Particularly Suspectable.**

59. Defendant's negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing such data.

60. Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of nefarious purposes, including ransomware, fraudulent misuse, and sale on the dark web.

61. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as his or her birthdate and mother's maiden name.

62. Data thieves regularly target entities collecting and storing PII and PHI like Defendant due to the highly sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

63. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable law firm, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

64. According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[6]

65. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not

---

[6] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accesses Feb. 9, 2024).

if a data breach will happen, but when."[7] Defendant itself acknowledges, "Understanding issues surrounding cybersecurity and being prepared for data breaches and compliance requirements are essential for any business."[8]

66. Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting entities like Defendant that collect and store PHI.

67. Entities in custody of PHI, like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[9] Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[10] Almost 50 percent of the victims lost their healthcare coverage as a

---

[7] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

[8] *See* https://www.gray-robinson.com/data-privacy-security-law.

[9] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last accessed May 8, 2024).

[10] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed May 8, 2024).

result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.

68. Thus, PHI has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[11]

69. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[12] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[13]

---

[11] https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.

[12] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[13] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

70. As law firm in possession of its clients' PHI, Defendant knew, or should have known, the importance of safeguarding the PHI entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendant failed to take appropriate cybersecurity measures to prevent the Data Breach.

71. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take reasonable steps to protect the Private Information of Plaintiff and Class Members from being wrongfully disclosed to cybercriminals.

72. Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

73. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to tens of thousands of individuals' detailed Private Information, and, thus, the significant

number of individuals who would be harmed by the exposure of that unencrypted data.

74. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

75. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

**D. Defendant Was Required, but Failed to Comply with FTC Rules and Guidance.**

76. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

77. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal

information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[14]

78. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15]

79. The FTC further recommends that companies not maintain confidential personal information, like Private Information, longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumers' confidential data, treating the failure to employ reasonable and appropriate measures to protect against

---

[14] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016),https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 8, 2024).
[15] *Id.*

unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

81. Such FTC enforcement actions include actions against businesses that fail to adequately safeguard PII like Defendant. *See, e.g., In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

82. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect sensitive personal information, like Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

83. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why

their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[16]

84. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

85. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**E. Defendant Was Required, But Failed to Comply with HIPAA.**

86. Defendant is a covered business and/or business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

87. Defendant is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

88. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security

[16] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

standards for protecting Private Information that is kept or transferred in electronic form.

89. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

90. HIPAA's Security Rule required and requires that Defendant do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

91. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and

appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

92. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

93. HIPAA further requires Defendant to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

94. HIPAA further requires Defendant to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

95. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance

documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[17] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[18]

96. As alleged in this Complaint, Defendant failed to comply with HIPAA and HITECH. It failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiff's and Class Members' Private Information, including PHI.

[17] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed Feb. 13, 2024).

[18] *Id.*

**F. Defendant Failed to Comply with Industry Standards.**

97. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

98. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[19]

[19] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Feb. 9, 2024).

99. In addition, the NIST recommends certain practices to safeguard systems[20]:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

100. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited

---

[20] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Feb. 9, 2024).

vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[21]

101. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other

[21] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last acc. Feb. 9, 2024).

industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

**G. Defendant Owed Plaintiff and Class Members a Common Law Duty to Safeguard their Private Information.**

102. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiff and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

103. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

104. Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner and act upon data security warnings and alerts in a timely fashion.

105. Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

106. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

107. Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**H. Plaintiff and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.**

108. Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately injured Plaintiff and Class Members by the resulting disclosure of their Private Information in the Data Breach.

109. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

110. Plaintiff and Class Members are also at a continued risk because their Private remains in Defendant's systems, which have already been shown to be

susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its clients' Private Information.

111. As a result of Defendant's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and they have all sustained actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendant; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

***Present and Ongoing Risk of Identity Theft***

112. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

113. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

114. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

115. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[24] Criminals in particular favor the

---

[22] 17 C.F.R. § 248.201 (2013).

[23] *Id.*

[24] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-

dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[25] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

116. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[26] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of

---

experian/what-is-the-dark-web/.

[25] *Id.*

[26] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

birth, and medical information.[27] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[28]

117. The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

118. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

119. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data

---

[27] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[28] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

120. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.

121. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[29]

---

[29] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

122. Health information is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.

123. Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[30]

124. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[31]

125. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[32]

126. The reality is that cybercriminals seek nefarious outcomes from a data breach and stolen health data can be used to carry out a variety of crimes.

---

[30]https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[31] *Id.*
[32] https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

127. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[33]

128. With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

129. The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the

[33] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

130. Thus, even if certain information (such as credit card numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package leading to the data.

131. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

132. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

133. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or

> personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[34]

134. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[35]

135. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[36] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their Private Information was stolen.

136. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[34] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

[35] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

[36] *Id.*

137. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

138. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

139. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

140. In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

141. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

142. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

143. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting

companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

144. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

***Diminished Value of Private Information***

145. Personal data like Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

146. For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance

[37] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Feb. 26, 2024).

companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

147. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

148. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

149. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

150. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Costs***

151. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

152. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

153. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers and medical histories).

154. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

155. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Lost Benefit of the Bargain***

156. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

157. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant, and paying Defendant, directly or indirectly, for its services, Plaintiff and Class Members, as consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

158. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## CLASS ALLEGATIONS

159. Plaintiff brings this class, individually on behalf of herself and on behalf of all members of the following Class of similarly situated persons:

> All persons residing in the United States whose Private Information may have been compromised in the Data Breach.

160. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendant has a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

161. Plaintiff reserves the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

162. Numerosity: The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. According to Defendant's reporting, the Class contains over 65,000 individuals.

163. Commonality and Predominance: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and

secure Plaintiff's and Class Members' Private Information from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect Plaintiff's and Class Members' Private Information violated the FTC Act, HIPAA, and/or state laws, and/or Defendant other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiff's and Class Members' Private Information;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiff and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

i. Whether Defendant's failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' Private Information;

j. Whether Defendant breached duties to protect Plaintiff's and Class Members' Private Information;

k. Whether Defendant's actions and inactions alleged herein were negligent;

l. Whether Defendant were unjustly enriched by their conduct as alleged herein;

m. Whether an implied contract existed between Class Members and Defendant with respect to protecting Private Information and privacy, and whether that contract was breached;

n. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

164. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of herself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

165. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her Private Information compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

166. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to, or conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

167. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties

are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

168. <u>Injunctive and Declaratory Relief:</u> Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

169. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to (a) whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, and safeguarding

their Private Information; (b) whether Defendant failed to adequately monitor and audit their data security systems; and (c) whether Defendant failed to take reasonable steps to safeguard the Private Information of Plaintiff and Class Members.

170. All members of the proposed Class are readily ascertainable. Defendant has access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

171. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 170 above as if fully set forth herein.

172. Defendant required Plaintiff and Class Members to submit sensitive, confidential Private Information to Defendant as a condition of receiving services from Defendant, and Plaintiff and Class Members provided their Private Information to Defendant.

173. Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons.

174. Defendant owed a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting the Private Information it collected from them.

175. Plaintiff and Class Members were the foreseeable victims of any inadequate data safety and security practices by Defendant.

176. Plaintiff and the Class Members had no ability to protect their Private Information in Defendant's possession.

177. By collecting, transmitting, and storing Plaintiff's and Class Members' Private Information Defendant owed Plaintiff and Class Members a duty of care to use reasonable means to secure and safeguard their Private Information, to prevent the information's unauthorized disclosure, and to safeguard it from theft or exfiltration to cybercriminals. Defendant's duty included the responsibility to implement processes by which it could detect and identify malicious activity or unauthorized access on its networks or servers.

178. Defendant owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that controls for its networks, servers, and systems, and the personnel responsible for them, adequately protected Plaintiff's and Class Members' Private Information.

179. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between it and its clients, which is recognized by laws and regulations including but not limited to the FTC Act and HIPAA, as well as the common law. Defendant was able to ensure its network servers and systems were sufficiently protected against the foreseeable harm a data breach would cause Plaintiff and Class Members, yet it failed to do so.

180. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

181. Pursuant to the FTC Act, 15 U.S.C. § 45 *et seq*., Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

182. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had the further duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI from unauthorized disclosure.

183. Pursuant to HIPAA, Defendant had a duty to implement reasonable data security measures for the PHI in its care, including by, *e.g.*, rendering the electronic PHI in a form unusable, unreadable, or indecipherable to unauthorized

individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See 45 C.F.R. § 164.304.

184. Additionally, pursuant to HIPAA, Defendant had a duty to provide notice of the Data Breach within 60 days of discovering it. See 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

185. Defendant breached its duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices and procedures to safeguard Plaintiff's and Class Members' Private Information, and by failing to ensure the Private Information in its systems was encrypted and timely deleted when no longer needed.

186. The injuries to Plaintiff and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violations of the FTC Act and HIPAA.

187. Plaintiff and Class Members are within the class of persons the FTC Act and HIPAA are intended to protect.

188. The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA are intended to guard against.

189. Defendant's failures to comply with the FTC Act or HIPAA constitute negligence *per se*.

190. Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' confidential Private Information in its possession arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to reasonably protect such Private Information.

191. Defendant breached its duties of care, and was grossly negligent, by acts of omission or commission, including by failing to use reasonable measures or even minimally reasonable measures to protect the Plaintiff's and Class Members' Private Information from unauthorized disclosure in this Data Breach.

192. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Maintaining and/or transmitting Plaintiff's and Class Members' Private Information in unencrypted and identifiable form;

c. Failing to implement data security measures, like adequate MFA for as many systems as possible, to safeguard against known techniques for initial unauthorized access to network servers and systems;

d. Failing to adequately train employees on proper cybersecurity protocols;

e. Failing to adequately monitor the security of its networks and systems;

f. Failure to periodically ensure its network system had plans in place to maintain reasonable data security safeguards;

g. Allowing unauthorized access to Plaintiff's and Class Members' Private Information; and

h. Failing to adequately notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate damages.

193. But for Defendant's wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised because the malicious activity would have been identified and stopped before criminal hackers had a chance to inventory Defendant's digital assets, stage them, and then exfiltrate them.

194. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in Defendant's industry.

195. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

196. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft, or the imminent and substantial risk of identity theft or fraud; (d) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; (f) anxiety and emotional harm due to their Private Information's disclosure to cybercriminals; and (g) the continued and certainly increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

197. Plaintiff and Class Members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

198. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate and lifetime credit monitoring to Plaintiff and all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

199. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 170 above as if fully set forth herein.

200. Defendant required Plaintiff and Class Members to provide and entrust their Private Information to Defendant as a condition of and in exchange for receiving services from Defendant.

201. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

202. Specifically, Plaintiff and Class Members entered into valid and enforceable implied contracts with Defendant when they agreed to provide their Private Information to Defendant, and Defendant agreed to reasonably protect it.

203. The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promises to protect Private Information it collected from Plaintiff and Class Members, or created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this Private Information in reliance on Defendant's promises.

204. Under the implied contracts, Defendant promised and was obligated to (a) provide services to Plaintiff and Class Members; and (b) protect Plaintiff's and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiff and Class Members agreed to provide Defendant with payment and their Private Information.

205. Defendant promised and warranted to Plaintiff and Class Members to maintain the privacy and confidentiality of the Private Information it collected from Plaintiff and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

206. Defendant's adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Defendant.

207. Defendant solicited and invited Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

208. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act and HIPAA, as well as industry standards.

209. Plaintiff and Class Members who contracted with Defendant for services including reasonable data protection and provided their Private Information to Defendant reasonably believed and expected that Defendant would adequately employ adequate data security to protect that Private Information.

210. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information to Defendant and agreed Defendant would receive payment for, amongst other things, the protection of their Private Information.

211. Plaintiff and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendant.

212. Defendant materially breached its contractual obligations to protect the Private Information it required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendant's inadequate data security measures and procedures.

213. Defendant materially breached its contractual obligations to deal in good faith with Plaintiff and Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify Plaintiff and Class Members of the Data Breach.

214. Defendant materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes or regulations like Section 5 of the FTC Act and HIPAA, and by failing to otherwise protect Plaintiff's and Class Members' Private Information, as set forth supra.

215. The Data Breach was a reasonably foreseeable consequence of Defendant's breaches of these implied contracts with Plaintiff and Class Members.

216. As a result of Defendant's failures to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendant, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal

to the difference in the value of the services with data security protection they paid for and that which they received.

217. Had Defendant disclosed that its data security procedures were inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with Defendant.

218. Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contracts between them and Defendant.

219. Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely or adequate notice that their Private Information was compromised in and due to the Data Breach.

220. As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

221. Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff and the Class)**

222. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 170 above as if fully set forth herein.

223. Given the relationship between Defendant and Plaintiff and Class Members, where Defendant became guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

224. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their Private Information.

225. Because of the highly sensitive nature of the Private Information, Plaintiff and Class Members (or their third-party agents) would not have entrusted

Defendant, or anyone in Defendant's position, to retain their Private Information had they known the reality of Defendant's inadequate data security practices.

226. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' Private Information.

227. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

228. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

229. Plaintiff restates and realleges paragraphs 1 through 170 above as if fully set forth herein.

230. Plaintiff and Class Members conferred a benefit on Defendant by way of paying Defendant to maintain Plaintiff's and Class Members' Private Information.

231. The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing

reasonable data security and protection to Plaintiff's and Class Members' Private Information.

232. Defendant failed to provide reasonable security, safeguards, and protections to Plaintiff's and Class Members' Private Information, and was thus overpaid.

233. Under principles of equity and good conscience, Defendant should not be permitted to retain the money because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information that they paid for but did not receive.

234. Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

235. Defendant's enrichment at the expense of Plaintiff and Class Members is unjust.

236. As a result of Defendant's wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against

Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all claims herein so triable.

Dated: April 28, 2026

Respectfully submitted,

By: /s/ *Mariya. Weekes*

Mariya Weekes (FBN 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (786) 206-9057
mweekes@milberg.com

*Counsel for Plaintiff and the Putative Class*